United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 15, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 05-41864

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN CARDENAS CASTANEDA,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:00-CR-514-2

———————————————

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

A jury convicted defendant Juan Cardenas Castaneda for robbing a bank in 1996. Cardenas appeals, arguing that the Government violated his Sixth Amendment right to a speedy trial by indicting him in December of 2000 and trying him in August of 2005, that the district court erred in admitting under Federal Rule of Evidence 404(b) eye-witness testimony from an uncharged 1995 bank robbery, and that insufficient evidence supported the verdict. We affirm.

I

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Between 1994 and 1996, in Brownsville, Texas, small groups of armed hispanic men robbed several banks and armored cars outside of banks. One of those robberies occurred around 9:30 a.m. on May 4, 1995, during which at least four men, some armed with M-16s, drove to an armored car in front of First Bank Sunrise, robbed the car after disarming the guards at gunpoint, then drove away and abandoned the getaway car. Soon after that robbery, two eyewitnesses - a bank employee named Diana Perez and a FedEx driver named Kevin Saenz - identified Cardenas from photo line-up as a back-seat passenger in the getaway car. Another eyewitness identified Cardenas's brother as a man who stood beside her car, pointing a gun at her and her child, angry that she had warned someone leaving the bank of the robbery. A day later, an FBI agent interviewed Cardenas where he lived in Matamoros, Mexico; Cardenas named four alleged conspirators - Julio Torres, Rafael Guerrero, Oscar Venegas, and Hector Corbian - but denied his own involvement, and he was not arrested.

Another robbery occurred on January 22, 1996. At about 5:20 p.m., several armed man wearing ski-masks robbed the Texas Bank & Trust Company after commandeering the entire bank (instead of silently slipping a note to the teller) and assaulting some employees. They sped away in a car after removing their masks and later abandoned the car. One eyewitness, Maria Castillo, saw some of the robbers run to the car, which she later described precisely, including the plate number to within one correct character;

2

Cardenas's brother had purchased the car in Mexico. Castillo also described in detail three of the robbers. Soon after the robbery, she picked Cardenas out of a photo line-up as one of the robbers. She picked out Venegas as well, but she could not identify the third robber. Another witness also identified Venegas from a photo line-up. One robber dropped his ski mask before leaving the bank; DNA from that mask was definitively matched to Guerrero, a Mexican narcotics officer whose brother worked at the Texas Bank & Trust Company. The other three masks were found in the abandoned car; these were tested against a sample from Cardenas in 2005, but there was insufficient genetic material for testing.

A Texas Ranger showed a 48-photo line-up to Castillo and Perez on January 3, 1997 and Saenz on April 11, 1997. Perez and Saenz identified Cardenas as the back-seat passenger during their robbery; Castillo identified Cardenas and two other men as "resembling" the right front passenger in hers.

A grand jury indicted Cardenas for the 1996 robbery on December 5, 2000. The indictment and arrest warrant were sealed. Cardenas and Guerrero were charged with the crime by superseding indictment on July 31, 2001. That indictment and warrant were also sealed. Guerrero was convicted of the robbery in 2001, having already been convicted of a similar 1994 robbery.[1] Cardenas entered the United States from Mexico and committed traffic

[1] *See United States v. Guerrero*, No. 01-41115 (5th Cir. Apr. 3, 2003) (unpublished) (affirming conviction).

3

violations several times during the early 2000s, but he was never arrested for the robbery.  He was eventually arrested on March 25, 2005, while crossing the border, and the Government unsealed the indictment three days later.

The issue at trial was whodunit.  Castillo testified that she identified Cardenas on the day of the 1996 robbery but that she couldn't identify him in court, almost 10 years later.  Over objection, the Government introduced under Rule 404(b) evidence of the ostensibly similar 1995 robbery, which Cardenas allegedly perpetrated, to establish identity for the 1996 robbery.  Specifically, Perez and Saenz testified, like Castillo, that they identified Cardenas on the day of their robbery but couldn't identify him in court.  The jury convicted Cardenas.

Cardenas moved for a new trial, asserting, *inter alia*, the right to a speedy trial.[2]  The court denied the motion after balancing the factors announced by the Supreme Court in *Barker v. Wingo*.[3]

## II

Cardenas first claims that the delay between indictment and

---

[2] Cardenas had earlier filed, and the court had denied as untimely, a motion to dismiss based on this claim.  However, speedy trial claims are best analyzed after the facts have been developed, *see United States v. Frye*, 372 F.3d 729, 737 (5th Cir. 2004), hence the court properly analyzed the claim post-trial.

[3] 505 U.S. 647 (1992).

trial violated his Sixth Amendment right to a speedy trial.[4]  We review the district court's balancing of the *Barker* factors for clear error.[5]

In analyzing a Sixth Amendment speedy trial claim, this court considers the four *Barker* factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's diligence in asserting his Sixth Amendment right; and 4) prejudice to the defendant resulting from the delay.[6]  The Supreme Court clarified in *Doggett v. United States*[7] that there is a "threshold inquiry [of] whether the delay was long enough to trigger a speedy trial analysis;" only if that threshold, which is generally one year, is met, do we proceed weighing the factors.[8]  If the first three factors strongly favor the defendant, prejudice is presumed; if they do not, the defendant must show actual prejudice.[9]  This court "generally ha[s] found presumed prejudice only in cases in which the post-indictment

---

[4] Any delay between the crime and indictment is irrelevant.  *See Frye*, 372 F.3d at 736-37.

[5] There is an argument that although we should review findings of fact for clear error, we should review the balancing of those facts *de novo*.  *Frye*, 372 at 735-36.  As in *Frye*, we decline to decide the issue because the court's order survives review under either standard.

[6] *See United States v. Bergfield*, 280 F.3d 486, 488 (5th Cir. 2002).

[7] 505 U.S. 647, 651 (1992)

[8] *Bergfield*, 280 F.3d at 488; *see also Doggett*, 505 at 652 n.1 (stating one year number); *Bergfield*, 280 F.3d at 488 (same).

[9] *Bergfield*, 280 F.3d at 488.

delay lasted at least five years."[10]

Here, the delay between indictment and trial was about four years and nine months. This satisfies the threshold inquiry, so we proceed to weigh the first three factors, including the length of delay. The reason for the delay appears to be the Government's negligence in arresting Cardenas: he crossed the border and received traffic tickets several times. Moreover, officers most likely knew his location given that they interviewed him in Matamoros and there is no indication that Cardenas was on the run. And even if he were, there is no indication that officers attempted to glean from Guerrero, who was imprisoned, where Cardenas was. In sum, we can't credit the Government's assertion that the reason for delay was Cardenas's living in Mexico. The Government argues that Cardenas wasn't diligent in asserting his right because he didn't assert it until a fortnight before trial, but that only renders Cardenas passive during the few months after arrest; he didn't know about the indictment or warrant before his arrest, so we can't say he should've asserted the right then.

Although these factors favor Cardenas, they do not warrant a finding of presumptive prejudice. First, the delay was a few months shy of our general five-year cutoff; it was not the eight-and-a-half years about which the Court in *Doggett* was focused in finding presumed prejudice. Second, the delay here was the result

---

[10] *See United States v. Serna-Villareal*, 352 F.3d 225, 232 (5th Cir. 2003).

of negligence, which, although inappropriate and supportive of presumed prejudice if the delay is sufficiently long, is not as damning as official bad faith.[11]  In short, this isn't the *Doggett*-type case where there is serious concern about the defendant's inability to prove (or even identify) prejudice.

Looking to whether Cardenas suffered actual prejudice, it's clear he wasn't subject to two of the three harms of delay identified by the Supreme Court - oppressive pretrial incarceration and anxiety and concern - because he was unarrested and unaware of his indictment during the delay.[12]  As the court held in *Doggett*, however, the third harm - prejudice stemming from dimmed memories and loss of exculpatory evidence - is most important.[13]  And here the passage of time favored Cardenas.  As the Government notes, the witnesses testified that they identified Cardenas at the time of the crimes, but they testified that they could not identify him in the courtroom; an earlier trial would've increased the likelihood of the witnesses' identifying Cardenas in court.  Cardenas states that the dimmed memories harmed him, but his conclusory allegation is unfounded.[14]  Cardenas also alleges that hair and DNA samples

---

[11] *Doggett*, 505 U.S. at 656-57.

[12] *Id.* at 654.

[13] *Id.*

[14] The Government, in defending the witnesses' credibility, argued that they couldn't be expected to remember clearly almost ten years after the crime. This argument merely attempted to limit damage to the Government; it did not render the dimmed memories helpful to the Government.

could've been tested and could've exonerated him had the trial been earlier; if true,[15] this allegation would have some legs, but in the end it's insufficient because the lack of a DNA and hair match at trial was noted, helping Cardenas. *Excluding* Cardenas as a suspect through DNA and hair would have required positive matches for a specific number of other robbers, a speculative proposition given disagreement over exactly how many robbers were involved and the probability that not all would have left samples.

                                III

Cardenas next claims that the district court erred in admitting under Federal Rule of Evidence 404(b) eyewitness testimony from the uncharged 1995 armored-car robbery. Such evidence of extraneous acts is admissible under Rule 404(b) to prove identity if the circumstances of the extraneous act "were so similar to the offense in question that they evince a signature quality, marking the extraneous act as the handiwork of the accused."[16] Two factors are relevant in unpacking the government's *modus operandi* theory. The first is the distinctiveness of the

---

[15] According to the record, the FBI would not test a DNA sample – here, the mask allegedly worn by Cardenas – without an exemplar against which to compare it. An exemplar from Cardenas was sent in 2005 after his arrest, and there was no match. The record is unclear as to whether "no match" meant that the mask always had insufficient genetic material for testing or whether sufficient material existed initially but degraded by 2005. And even if the sample degraded, it's unclear if it degraded soon after the crime, making testing unavailable even just a year or so later. The record is unclear as to whether Cardenas's fingerprints were tested against any left at the scene or whether there was a match. The Government doesn't address either point.

[16]*United States v. Guerrero*, 169 F.3d 933, 939 (5th Cir. 1999).

crimes and the second is the proximity of the crimes in space and time.[17]

We are satisfied of the geographic and temporal proximity of the two robberies. Both were in Brownsville, Texas, and were seven months apart. A juror might reasonably connect two such crimes.[18] This is not a case, like *Carroll*, where an entire decade separated the government from its evidence.[19]

The distinctiveness of the crimes is a more difficult question. The government argues that the facts of the crimes were "remarkably similar." The robbers were all hispanic; they struck when few people were near the bank (or the armored car); they brandished guns to threaten bank employees (or drivers); they approached the scene in one vehicle, in which they fled and promptly abandoned.

That's no Great Brinks Robbery. Yet we must affirm the 404(b) ruling, bound by our prior decision in *Guerrero*, a case which approved of the use of 404(b) evidence based on *modus operandi* facts nearly identical to ours.[20] Indeed, Guerrero's appeal

---

[17]*See id.; see also United States v. Carroll*, 207 F.3d 465, 469 (8th Cir. 2000).

[18] *See Smith*, 103 F.3d at 603 (one month apart) *and Moore*, 115 F.3d at 1355 ("a few months" apart).

[19]*United States v. Carroll*, 207 F.3d at 470.

[20] *United States v. Guerrero*, 169 F.3d 933, 939 (5th Cir. 1999). In *Guerrero*, "(1) all three robberies occurred in Brownsville within a relatively short period of time; (2) each occurred during times of minimal bank traffic; (3) in each, a vehicle suddenly pulled up; (4) the robbers were wearing dress-casual clothes, but not masks; (5) the robbers in the first two robberies wore

involved the same men on the same crime spree, and Guerrero was later Cardenas's co-defendant, in the present case.

                                    IV

Finally, Cardenas challenges the sufficiency of the government's evidence. He notes that the second time Maria Castillo was shown a photo line-up, she identified him, as well as two other strangers to this case, as men "resembling" one of the robbers. No reasonable jury, he urges, could have found him guilty beyond a reasonable doubt.

Yet as we have explained, the government properly introduced two more eye witnesses under 404(b). We will not re-weigh the credibility of these witnesses, especially when their credibility was already challenged at trial. There was sufficient evidence for a reasonable jury to convict.

The judgment of conviction is AFFIRMED.

---

sunglasses, as did the driver in the last; (6) each occurred outside the bank while funds were being transferred; (7) the only witnesses were bank or armored car employees; (8) the employee in control of the money was the one assaulted; and (9) the getaway vehicle was found abandoned near each bank." *Id.*